BAHR CORPORATION *v*. FRANK O'BRION ET AL.

NEW HAVEN REDEVELOPMENT AGENCY *v*. BAHR CORPORATION ET AL.

DALY, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued February 3—decided March 4, 1959

*Ralph C. Dixon,* with whom were *Palmer S. Mc-Gee, Jr.,* and, on the brief, *C. Duane Blinn* and *Ray-*

*mond B. Green,* for the appellants (plaintiff in the first case and defendants in the second).

*Donald F. Keefe,* with whom were *Walter G. Farr, Jr., Harold Grabino* and, on the brief, *William R. Murphy* and *William L. F. Felstiner,* for the appellees (defendants in the first case and plaintiff in the second).

DALY, C. J. These appeals in separate cases were combined by order of the court in accordance with the provisions of § 382 of the Practice Book. The Bahr Corporation, hereinafter referred to as the plaintiff, brought the first action in October, 1958. Five of the six defendants in that case are the members of the New Haven Redevelopment Agency, hereinafter referred to as the agency. The complaint as amended contained six counts. The plaintiff sought an injunction restraining the agency from taking further action in the condemnation of the plaintiff's property and from interfering with the use of the property by the plaintiff or its tenants; a judgment declaring that the Redevelopment Act, §§ 979-988 of the 1949 Revision of the General Statutes as amended (Rev. 1958, §§ 8-124–8-139), is unconstitutional; a judgment declaring that the acts of the agency described in the amended complaint were "arbitrary, unreasonable, discriminating, an abuse of the powers conferred upon it, a violation of public policy, a deprivation of property without due process of law and therefore invalid and void"; and other relief. By their answer the defendants admitted some of the allegations contained in the amended complaint and denied others. The answer contained three special defenses. In and by a counterclaim the agency sought a declaratory judg-

ment determining that the adoption of the Church Street redevelopment and renewal plan by the agency and the approval of it by the board of aldermen were entirely valid and complied with all applicable laws.

In the second case the agency, by a written application addressed to Judge Joseph W. Bogdanski of the Superior Court, sought an order directing the clerk of the Superior Court within and for the county of New Haven to issue an execution putting the city of New Haven and the agency, as its agent, into peaceable possession of the plaintiff's premises as of February 1, 1959. An order directing the plaintiff and its tenants, The Savitt Company and Waldorf System, Inc., to appear on November 5, 1958, to show cause why the application should not be granted was issued. By its judgment dated November 13, 1958, the court found the issues in the first action for the defendants on the amended complaint and the counterclaim. The plaintiff's appeal from that judgment was filed on November 26, 1958. Also on November 13, 1958, Judge Bogdanski ordered the clerk of the court to issue, on February 1, 1959, an execution to put the city and the agency, as its agent, into peaceable possession of the plaintiff's property. The plaintiff and its tenants appealed from that order on November 28, 1958.

The finding, so far as it is not attacked, sets forth the following facts: The plaintiff is the owner of business property at 86-96 Church Street in New Haven. The Savitt Company and Waldorf System, Inc., conduct retail businesses on the premises. The agency was created pursuant to § 980 of the 1949 Revision (Rev. 1958, § 8-126). The building on the plaintiff's property is a modern two-story one. It is situated in a choice retail location in downtown New

Haven, on the perimeter of the Church Street redevelopment and renewal area. Property on the other side of Church Street is not included in the redevelopment area. The Malley department store building, a large old building on the northwest corner of the block in which the plaintiff's property is located, is not included in the redevelopment area. Certain other properties lying within the redevelopment area were permitted to remain unchanged. The block in which the plaintiff's property is located is referred to as block A in the redevelopment plan. It is the northernmost of the four blocks included in the plan which lie north of the Oak Street connector and west of Church Street. Its north side fronts on the New Haven green. The four blocks north of the Oak Street connector comprise only eight of the ninety-six acres included in the redevelopment area. Under the redevelopment plan, all buildings lying within these four blocks, except the Malley department store building, are to be demolished and the land is to be cleared. Buildings located in some of the other sectors, though within areas of renewal, will not be demolished.

Agreements for the disposition of certain land within the redevelopment area have been entered into by the agency with the Stevens New Haven Development Company, Inc., and the First New Haven National Bank. The only land involved in these agreements is in block A and the other three blocks lying north of the Oak Street connector. Of the ninety-six acres within the redevelopment area, approximately five will be disposed of by the proposed transfer to the Stevens New Haven Development Company of land on Church Street running south from Chapel Street, including substantially all of the plaintiff's property. The land proposed to be

transferred to the First New Haven National Bank consists of property in block A on which the Gamble-Desmond department store once stood, a thoroughfare known as Gregson's Alley, and the rear five feet of the plaintiff's property. The agency included the four blocks in its application for a preliminary federal planning and survey grant in July, 1955. The final project report to the federal government and the redevelopment plan as ultimately adopted on July 10, 1957, included the four blocks. In the meantime, the agency had given particular consideration to the question whether the four blocks should continue to be included, as appears from a document entitled "Planning Criteria for Determining the Boundaries of the R-2 Renewal Area— Special Rotival Report." The plaintiff submitted a statement to the agency expressing opposition to the inclusion of its property in the redevelopment plan and its willingness and ability to integrate its property with the plan within the time prescribed. On or about July 10, 1957, the agency made a declaration of its findings, approving the redevelopment plan. At a public hearing held by the board of aldermen committee on streets and squares, a representative of the plaintiff objected to the inclusion of its property in the plan. Thereafter, the board of aldermen approved the plan. The plaintiff's building is neither substandard nor insanitary. The land which the Gamble-Desmond department store formerly occupied has been vacant since 1954. Another building in the block, on the northeast corner, is neither substandard nor insanitary. Block A and the other three blocks north of the Oak Street connector are within the central business district of New Haven, and block A is in the retail center of the city. Prior to July, 1955,

when the agency approved the application for preliminary surveys for submission to the federal government, these surveys to include block A and the other three blocks north of the Oak Street connector, block A had not been a part of any redevelopment area planned for the city. Instead, the plans provided for the gradual reconstruction of the central business district and retail center by private enterprise and through private initiative.

In August, 1953, a report captioned "New Haven Short Approach Master Plan" was submitted to the mayor by Lloyd B. Reid, traffic consultant, and Maurice E. H. Rotival, planning consultant. The report dealt particularly with highway design and urban redevelopment. This 1953 master plan was the culmination of a number of earlier plans for the city. It included the Gilbert Olmstead plan of 1910, two studies by Rotival—the original master plan of 1941 and a southwest area study in 1943 which embraced the central business district—and two reports to the agency, one in July, 1951, and the other in December, 1951, by Rotival in collaboration with the city plan department. The object of the 1953 plan was to give definite form to the conclusions reached in the reports of July and December, 1951. The Gilbert Olmstead plan, the master plan of 1941 and the southwest area study were part of the administrative record filed in the trial court. One of the advantages of the 1953 plan was stated in it to be "Promotion of the gradual reconstruction, through private initiative, of the entire retail center of the City between the Oak Street feeder and Chapel Street." The 1953 plan envisioned nine different redevelopment areas within the city, not one of which included block A. It provided that "[t]he major part of new construction, remodeling and

other changes in the Central Business District will be executed by private enterprise," and that "[c]onsiderable time is of course required for any substantial changes to take place, but on the other hand the time lapse involved remains relatively brief in relation to the life-span of a city."

The staff of the agency, the redevelopment administrator, the director of city planning and counsel for the agency determined which exhibits the executive director of the agency, the city planning director and the redevelopment administrator would present when they testified at a public hearing held by the agency on June 28, 1957. Other witnesses at this hearing presented exhibits with their testimony. Members of the public were invited to make statements, ask questions and present material as they desired. No person was deprived of any requested opportunity to testify or to cross-examine.

Prior to the action of the agency in July, 1955, the operation of the Gamble-Desmond department store had ceased. G. Harold Welch, individually or through the Harwel Corporation which he controlled, then acquired leasehold interests in the Gamble-Desmond property. Gregson's Alley was located on it. An archway over the alley would be necessary if a single building occupied all of the property. Welch requested permission from the board of aldermen to close Gregson's Alley. Its closing was opposed by the owners of stores in the locality, including the plaintiff. Welch's request was not granted. In the fall of 1954 and the spring of 1955, Welch consulted representatives of the city with respect to the closing of the alley and his leasehold interests in the Gamble-Desmond property. In the spring of 1955, Roger Stevens of New York, a private real estate investor, was approached in

connection with the redevelopment plans. Although steps were taken by the agency in July, 1955, to proceed with a federal redevelopment project in the area, including block A, representatives of the agency, the city and Stevens were in contact with representatives of the plaintiff on several occasions in May, 1956, with respect to Stevens' acquiring the plaintiff's property by private purchase. On June 11, 1957, the president of the plaintiff was called to the office of the mayor to be given advance notice of the Church Street redevelopment and renewal plan. That plan was announced to the public on the following day in an elaborate public ceremony at the New Haven Lawn Club. Frank O'Brion and Harry Barnett, chairman and vice chairman of the agency, took part in the program and publicly spoke in favor of the plan. Stevens also spoke at the ceremony.

On June 28, 1957, the public hearing on the redevelopment plan was held by the agency. In the engineering report on buildings, including buildings in block A, filed with the agency at the hearing by the director of city planning, it was stated that block A was roughly two-thirds substandard and one-third standard. The members of the agency considered all the material presented at the hearing, toured the redevelopment area afterwards, met in executive session on five different occasions, specifically considering all the questions raised by persons opposing the plan in whole or in part, including the plaintiff, and, on July 10, 1957, decided to approve the plan with some changes.

In September, 1957, the plaintiff instituted an action against the members of the agency for a declaratory judgment determining whether the redevelopment plan was valid. The agency, commencing

in May, 1958, and continuing to the time of the trial of the present action, acquired a considerable number of parcels of land within the redevelopment area. From May, 1958, until June 10, 1958, while the earlier action was still pending, the agency procured property in excess of $900,000 in value. From the institution of the present action in October, 1958, to the time of trial on November 5, 1958, considerable additional property was obtained. Between June 10, 1958, and November 6, 1958, the agency acquired sixty parcels within the redevelopment area at a cost of $8,533,000. An agreement for the disposition of approximately 230,000 square feet of land by the city and the agency to the Stevens New Haven Development Company was signed on September 4, 1958, and a down payment of $430,000, representing approximately 10 per cent of the purchase price, was received. The agency completed negotiations for the disposition of property to the First New Haven National Bank, including a portion of the property upon which the plaintiff's building stands, and agreed to make this property available by February 1, 1959. The pace of the agency in acquiring property was steady and was maintained regardless of whether there were lawsuits pending. If the city fails to deliver to the Stevens New Haven Development Company, on the date agreed upon, substantially all of the plaintiff's property, that company has the option of terminating its agreement and demanding repayment of the entire deposit.

In the first count of the amended complaint, the plaintiff alleged that the Redevelopment Act (now Rev. 1958, §§ 8-124–8-139) is unconstitutional because it fails to provide any opportunity for judicial review of the validity of the taking of the plaintiff's property. "The right of appeal exists only under

statute . . . and parties have no vested right thereto.
. . . It is not essential to the constitutionality of a
statute which authorizes an administrative board to
make orders . . . that it contain a provision for an
appeal, in the technical sense, from the board's ac-
tion.  If any person claims to be harmed by such
an order, his constitutional right to due process is
protected by his privilege to apply to a court." *State*
v. *Vachon,* 140 Conn. 478, 485, 101 A.2d 509.  The
plaintiff's claim is without merit.

The plaintiff claims that the court erred in con-
cluding that the plaintiff was "barred by laches from
asserting the claims set forth in its complaint."  The
plaintiff concedes that its earlier action was with-
drawn in June, 1958.  Section 8-128 of the 1958 Re-
vision (Public Acts 1957, No. 13, § 54) provides in
part: "The redevelopment agency may acquire real
property by eminent domain with the approval of
the legislative body of the municipality and in ac-
cordance with the provisions of sections 8-129 to
8-133, inclusive, and this section."  Section 8-129
(Public Acts 1957, No. 270, § 1) provides that the
agency shall determine the compensation to be paid
to the persons entitled thereto for real property and
shall file a statement of compensation and a deposit
and bond with the clerk of the Superior Court; that
upon filing these, the agency shall forthwith cause
a copy of the statement of compensation to be re-
corded in the office of the town clerk, "such record-
ing to have the same effect as and to be treated the
same as the recording of a lis pendens"; and that the
agency shall forthwith give notice to each person
appearing of record as an owner of the property or
as having an interest therein.  Section 52-325 pro-
vides that the plaintiff in any action intended to af-
fect real estate may cause to be recorded in the office

of the town clerk a lis pendens, that is, a notice of the pendency of the action. The trial court found that the plaintiff brought the present action, in which it sought an injunction restraining the agency from taking any further action or proceedings for the condemnation or taking of the plaintiff's property, and a declaratory judgment, on October 17, 1958, after a "Notice of Taking" was caused to be served by the agency on the plaintiff. When the plaintiff's earlier action was withdrawn, the notice of taking had not been served on the plaintiff. Consequently, a judgment in that action could not have determined the issues raised in the instant action. Furthermore, the agency could have, before the withdrawal of that action, filed a counterclaim seeking a declaratory judgment, as it did in the instant action. The withdrawal of the earlier action would not have impaired the right of the agency to prosecute a counterclaim, if one had been filed prior to the withdrawal. *Lusas* v. *St. Patrick's Roman Catholic Church Corporation,* 123 Conn. 166, 168, 193 A. 204; Practice Book § 111.

In addition, the court found that the pace of the agency in acquiring property was steady and "completely independent of whether or not there were any lawsuits pending"; that the agency, commencing in May, 1958, and continuing to the time the trial of the instant case was commenced on November 5, 1958, acquired a considerable number of parcels of land within the redevelopment area; that between May, 1958, and June 10, 1958, while the plaintiff's earlier action was still pending, the agency acquired property in excess of $900,000 in value; and that between October 17, 1958, when the instant action was instituted, and the time the trial of it was started, considerable additional property was acquired by

the agency. The conclusion of the court that the plaintiff was barred by laches from asserting the claims set forth in its complaint is supported neither by any finding of fact nor by any conclusion, based upon facts found, to the effect that the delay between June 10, 1958, when the prior action was withdrawn, and October 17, 1958, when the instant action was commenced, was inexcusable. On the contrary, the record, showing that the notice of taking was not served upon the plaintiff until about October 10, 1958, clearly indicates that a valid determination that there was an inexcusable delay on the part of the plaintiff in not instituting the instant action until after October 10, 1958, could not be made. The court did not find that the agency did anything, after the prior action was withdrawn on June 10, 1958, which it would not have done if that action had not been withdrawn, or failed to do anything it would have done. There was no finding that the agency was prejudiced in any way. "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant." *Kurzatkowski* v. *Kurzatkowski,* 142 Conn. 680, 684, 116 A.2d 906. "Prejudice by delay in instituting an equitable action is an essential element of laches." *Miller* v. *McNamara,* 135 Conn. 489, 497, 66 A.2d 359. "Laches in legal significance is not mere delay but delay that works a disadvantage to another." *Mills* v. *Mills,* 119 Conn. 612, 621, 179 A. 5. The trial court erred in concluding that the plaintiff was "barred by laches from asserting the claims set forth in its complaint."

As stated in the plaintiff's brief, the principal question presented by this appeal is whether the court erred in excluding evidence offered by the plaintiff. It had alleged that the taking of its prop-

erty was for a private, not for a public, purpose, and that the inclusion of its property within the redevelopment area was unreasonable, arbitrary, discriminatory and an abuse of the agency's powers. These allegations were denied in the answer, and the issues thus raised became the principal ones in the case. In excluding the evidence offered to prove these allegations, the court stated that the basis of its ruling was the plaintiff's failure to allege fraud on the part of any member or members of the agency. Counsel for the agency, in his argument in this court, asserted that since the plaintiff had not claimed fraud on the part of any member of the agency or its staff, the court did not err in excluding the evidence. The same erroneous statement is contained in the agency's brief. In *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 146, 104 A.2d 365, we said: "The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive; it is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred." The decision of the condemnor that a necessity exists for the taking of particular property "is one open to judicial review to discover if it was unreasonable, or in bad faith, or an abuse of the power conferred, and . . . the appropriation of the property will be restrained if it be found that such was the character of the decision." *Water Commissioners* v. *Johnson,* 86 Conn. 151, 159, 84 A. 727. "[N]o definition of public use for the purpose of eminent domain can be large enough to include any private use, and however

elastic and indefinite the term 'public use' may be, it is certain that no additional or novel application of the power of eminent domain can justify the taking of property for a private use." *Connecticut College* v. *Calvert,* 87 Conn. 421, 424, 88 A. 633. The court was called upon to determine whether the taking of the plaintiff's property was for a private purpose rather than a public one or was unreasonable or an abuse of the power conferred upon the agency, as alleged in the amended complaint. The court erred in refusing to admit the evidence which the plaintiff claimed at the trial, and now claims, was offered to prove those allegations.

The agency has asserted that an early determination of the questions raised by these appeals is of great importance to the public. If that is true, it is unfortunate that, during the trial, the agency resisted every effort by the plaintiff to introduce evidence to prove that its property was being taken for a private use rather than a public one or that the taking of it was unreasonable or an abuse of the power conferred upon the agency. Of course, as in any case where a new trial is ordered because the court erred in excluding evidence, we cannot say that if the evidence which was offered had been received the court would have concluded that the plaintiff had sustained the burden of proving its allegations. The agency, however, must assume at least part of the responsibility for the delay which will be caused by the necessity for a new trial.

Since an order directing the clerk of the Superior Court to issue an execution putting the agency into peaceable possession of the plaintiff's property cannot be made if upon judicial review it is discovered that the taking of the property was illegal, as claimed by the plaintiff, the granting of the applica-

tion for such an order constituted error. The application should not be granted unless, upon judicial review, it is discovered that the taking of the property was legal.

There is error in both cases, the judgments are set aside and the cases are remanded to be proceeded with in accordance with this opinion.

In this opinion the other judges concurred.